UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
COVENTRY ENTERPRISES LLC, a Delaware
Limited Liability Company,

                    Plaintiff,

      - against -

SANOMEDICS INTERNATIONAL HOLDINGS, INC.,
a Nevada corporation; CLSS HOLDINGS, LLC,
a limited liability company of unknown
origin,

                    Defendants.
---------------------------------------X

                    **MEMORANDUM AND ORDER**

                    14 Civ. 8727 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    In this breach of contract action, plaintiff contends that defendants breached an agreement for the sale of certain convertible securities. Plaintiff now moves for summary judgment, seeking rulings that defendants are liable for breach of contract and that the breach caused plaintiff damages arising from the lost opportunity to convert the withheld securities into stock to be resold at a profit. For the following reasons, we conclude that defendants are liable for breach of contract but that damages are inappropriate to resolve at this time. Accordingly, plaintiff's motion for summary judgment is granted in part and denied in part.

## I.  BACKGROUND[1]

This case arises from an agreement for the purchase of convertible debt securities.  The parties to the transaction, and to this case, are the issuer of the securities, defendant Sanomedics International Holdings, Inc. ("Sanomedics" or "SIMH");[2] the seller, defendant CLSS Holdings, LLC ("CLSS"); and the purchaser, plaintiff Coventry Enterprises LLC ("Coventry").[3]

On September 10, 2014,[4] defendants agreed to a "Memorandum of Terms" under which Coventry would purchase from CLSS $145,000 in principal, plus accrued interest, of a promissory note that had previously been issued to CLSS by Sanomedics.  Coventry 56.1 ¶¶ 3-4; see Bodenstein Decl. Ex. 1.  This pre-existing note was

---

[1]    Factual background is drawn from the following sources: (1) the parties' statements of material facts submitted pursuant to the Court's Local Rule 56.1 ("Coventry 56.1," ECF No. 30, and "Defs. 56.1," ECF No. 35); (2) the Declaration of Yakov Bodenstein in support of plaintiff's motion ("Bodenstein Decl."), ECF No. 27, and the exhibits attached thereto; and (3) the Declaration of Craig Sizer in opposition to the motion ("Sizer Decl."), ECF No. 34, and the exhibits attached thereto.

[2]    Effective February 9, 2015, Sanomedics changed its corporate name to Sanomedics, Inc.  See Sanomedics Int'l Holdings, Inc., Current Report (Form 8-K) (Feb. 6, 2015).

[3]    Craig Sizer is the president and sole member of CLSS.  See Aff. of Craig Sizer (Apr. 13, 2015), ECF No. 16.  Sanomedics' most recently filed annual report describes Sizer as "our former Chairman and CEO and one of our major shareholders."  Sanomedics, Inc., Annual Report (Form 10-K) (May 12, 2015), at 29.  As of the filing of that annual report, Keith Houlihan was Sanomedics' president and principal executive officer, and David C. Langle was its chief financial officer.  Id. at 50.

[4]    Except as specified, all events described herein took place in the year 2014.

convertible into Sanomedics stock pursuant to an associated note certificate. <u>See</u> Bodenstein Decl. Ex. 3 ("Note Certificate").[5]

On September 11, the parties entered into a "Debt Purchase Agreement" memorializing the terms of the sale to Coventry. <u>See</u> Bodenstein Decl. Ex. 2 (the "DPA"). CLSS agreed to sell the "Transferred Rights" to Coventry, defined as "all rights with respect to the $145,000.00 in principal under that promissory note . . . issued by Sanomedics." DPA ¶ 1. Sanomedics also executed the DPA, agreeing to "treat Buyer [Coventry] as party to, and having all the rights of the Seller [CLSS] with respect to the Transferred Rights." DPA ¶ 4.5(ii). By its terms, the DPA is an integrated agreement to be governed by New York law. DPA ¶¶ 6.3, 6.7.

The transaction, as described in both the Memorandum of Terms and the subsequent DPA, was to take place in three "closings," with the second to take place within thirty days of the first, and the third to take place within thirty days of the second. <u>See</u> DPA ¶ 3. Specifically, Paragraph 3 of the DPA describes the closing process as follows:

> The closing of the transactions contemplated by this Agreement (the "Closing") shall take place in

---

[5]     In particular, principal and accrued interest under the note could be exchanged for Sanomedics stock at a price equal to one-half the average of the three lowest closing bid prices over the past ten trading days. Note Certificate § 1.2(a). Other rules regarding the mechanics of conversion applied, including that the holder of the notes could not convert to become beneficial owner of more than 4.99% of all outstanding Sanomedics common stock at any one time. <u>Id.</u> § 1.1.

three separate closings.  At the first closing, which
shall occur upon the mutual execution of this
Agreement, the Buyer [Coventry] shall purchase from the
Seller [CLSS] $50,000 of the Assigned Portion [of the
Sanomedics promissory note] and shall pay to the Seller
the sum of[ ]$50,000 less $1,000 in legal fees.  At the
second closing, which shall occur within 30 days of the
first closing, and subject to market conditions, the
Buyer shall purchase from the Seller another $50,000 of
the Assigned Portion less $1K in legal fees.  At the
third closing, which shall occur within 30 days of the
second closing, and subject to market conditions, the
Buyer shall purchase from the Seller another $45,000 of
the Assigned Portion less $1K in legal fees.

DPA ¶ 3.

The first closing took place on September 11: Coventry paid

CLSS, and, that same day, Sanomedics informed its transfer agent,

and the transfer agent acknowledged, that Coventry was to be

issued a replacement note for $50,000.  Coventry 56.1 ¶ 8.

Coventry took possession of this note.  Defs. 56.1 ¶ 6.

Thirty days from the first closing date of September 11 was

October 11.  October 11 was a Saturday; October 12 was a Sunday;

and Monday, October 13, was the Columbus Day holiday.  Coventry

56.1 ¶ 13.

Between October 10 and October 13, the market price of

Sanomedics stock increased precipitously.[6]  Coventry 56.1 ¶ 27.

As a result, the holder of the Sanomedics convertible note stood

---

[6]    Defendants do not dispute this qualitative claim; however, they object
that the historical price data submitted by plaintiffs, see Bodenstein Decl.
Ex. 6, drawn from a Bloomberg data terminal, "are based upon inadmissible
hearsay," Defs. 56.1 ¶ 27.  This legal assertion is incorrect.  See Fed. R.
Evid. 803(17) (exempting from the rule against hearsay "[m]arket quotations .
. . that are generally relied on by the public or by persons in particular
occupations.").  In any event, because we do not rely on this data for any
quantitative purpose, the dispute is immaterial.

to make a substantial profit by converting the note to Sanomedics shares and selling the conversion shares to the public.  Id. ¶¶ 31-32.

On October 14, Coventry wired $49,000 to CLSS in an attempt to consummate the second closing.  Defs. 56.1 ¶ 9.  However, CLSS refused to consummate the second closing.  On October 15, at 11:43 AM, Craig Sizer wrote in an email to Jack Bodenstein, co-owner of Coventry, that "in light of several factors we are deciding not to move forward with the sale of the remaining balance of the note referenced in our original agreement." Bodenstein Decl. Ex. 12, at 1-2.

Bodenstein sought recourse from Sanomedics, writing at 12:32 PM to Sanomedics CFO David Langle that "I do not understand why you are not sending back the replacement note. . . .  You signed the Debt [P]urchase Agreement, and now you have to honor it.  I am sending you a conversion notice for 1,684,210 shares for $16,000 of the note."  Bodenstein Decl. Ex. 11.

In the meantime, Bodenstein had responded to Sizer to insist that the parties' agreement entitled him to the next note.  At 1:41 PM, Sizer replied, "[y]ou are outside the 30 day window and the note has already been converted."  Bodenstein Decl. Ex. 12, at 1.

Finally, Bodenstein emailed Sanomedics President Keith Houlihan, who responded at 4:20 PM that "CLSS has informed us

that they have issue with this matter and are not selling the note.  Please address this with their team as it's a CLSS and Coventry concern not Sanomedics."  Bodenstein Decl. Ex. 10, at 1.

On October 15, plaintiff, through counsel, sent defendants a demand letter alleging that defendants had breached the DPA. Bodenstein Decl. Ex. 13.  Ultimately, CLSS returned Coventry's $49,000 payment for the attempted second closing, and Coventry would never wire to CLSS the final $44,000 contemplated by the DPA with respect to the third closing.  Defs. 56.1 ¶¶ 10-11.

On November 3, Coventry filed its complaint in this Court. On February 5, 2015, defendants moved to dismiss the Complaint for failure to state a claim upon which relief can be granted. Defendants contended they were not bound to consummate the second closing because (1) Coventry's October 14 payment was not "within 30 days of the first closing" and therefore untimely under the DPA; and (2) the phrase "subject to market conditions" in the DPA's third paragraph rendered the parts of the DPA pertaining to the second and third closings illusory and unenforceable.  By Memorandum and Order dated July 23, 2015, we denied the motion, rejecting both of defendants' arguments.  See ECF No. 19 ("July 23 M&O").  Defendants answered the complaint on August 11, 2015.

Coventry now moves for summary judgment.  ECF No. 26. Coventry argues defendants breached the DPA and are liable for damages in the amount of at least $525,328, but perhaps as much

as \$1,278,000, based on Coventry's hypothetical analyses of the proceeds it would have earned had it been delivered the remaining \$95,000 of the convertible note, converted it to stock, and sold the conversion shares at prevailing market prices.   <u>See</u> Bodenstein Decl. Ex. 7; Pl.'s Reply to Defs.' Opp'n to Mot. for Summ. J. at 15.

## II. DISCUSSION

### A. Jurisdiction

The Court has jurisdiction under 28 U.S.C. § 1332 because the parties are of diverse citizenship and the amount in controversy exceeds \$75,000.[7]

### B. Standard of Review

A motion for summary judgment is appropriately granted when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986). Thus, in ruling on a summary judgment motion, "the district court must resolve all

---

[7]   By Memorandum and Order dated April 1, 2015, ECF No. 15, we directed the parties to supplement the record in order to demonstrate diversity of citizenship. As noted in our July 23 M&O, at 5 n.7, the affidavit and declarations filed in response sufficiently establish the parties' assertions that they are diverse.

ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (internal quotation marks omitted). The non-moving party must "cit[e] to particular parts of materials in the record" to show that "a fact . . . is genuinely disputed." Fed. R. Civ. P. 56(c)(1). Mere "conclusory allegations or denials" are insufficient to defeat the motion. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Deloach, 708 F. Supp. 1371, 1379 (S.D.N.Y. 1989) (citing R.G. Grp., Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984)). However, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute regarding a material fact and summary judgment is improper. Anderson, 477 U.S. at 248.

## C. Liability

On the question of liability, there is no genuine issue of fact for trial. Plaintiffs have established that defendants breached the DPA as a matter of law. Under New York law, "an action for breach of contract requires proof of (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) damages." First Inv'rs Corp. v. Liberty Mut. Ins. Co., 152 F.3d 162, 168 (2d Cir. 1998) (internal

quotation marks omitted).   It is undisputed that the DPA was signed by all three parties; that on October 14, Coventry wired CLSS the funds to consummate the second closing; that CLSS refused to cause a delivery of the second closing's replacement note; and that, as a result, Coventry was unable to convert the note and sell the conversion shares for a profit.

Defendants raise four arguments in opposition, but none is availing.

### 1. "Subject to Market Conditions"

First, we reject defendants' contention that the phrase "subject to market conditions" in Paragraph 3 of the DPA entitled them to refuse to consummate the second and third closings at their option.   Instead, the DPA unambiguously forecloses such a reading.

Under New York law, the initial question of whether a written contract is ambiguous is a question of law for the court. JA Apparel Corp. v. Abboud, 568 F.3d 390, 396 (2d Cir. 2009). "The key inquiry at this initial interpretation stage is whether the contract is unambiguous with respect to the question disputed by the parties."  Int'l Multifoods Corp. v. Commercial Union Ins. Co., 309 F.3d 76, 83 (2d Cir. 2002).  "Under New York law, the presence or absence of ambiguity is determined by looking within the four corners of the document, without reference to extrinsic evidence."  Chapman v. N.Y. State Div. for Youth, 546 F.3d 230,

236 (2d Cir. 2008).   "Contract language is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement."   Collins v. Harrison—Bode, 303 F.3d 429, 433 (2d Cir. 2002) (internal quotation marks omitted).   If the contract is not ambiguous, the court should assign the plain and ordinary meaning to each term, and it may then award summary judgment.   Int'l Multifoods, 309 F.3d at 83.

The relevant sentence in the DPA reads as follows:   "At the second closing, which shall occur within 30 days of the first closing, and subject to market conditions, the Buyer shall purchase from the Seller another $50,000 of the Assigned Portion less $1K in legal fees."   DPA ¶ 3.   A parallel provision governs the third closing with respect to the remaining $45,000 in principal.   Id.

These provisions do not authorize defendants to refuse to sell the remaining $95,000 of the note.   First, there is no indication, either in this sentence or anywhere in the DPA, that the DPA was intended to be an option contract.   Instead, the DPA uses mandatory language throughout.   See DPA § 1 ("the Seller hereby sells . . . and the Buyer agrees to purchase . . . all rights with respect to $145,000.00 in principal"); id. § 3 ("The closing of the transactions . . . shall take place [i]n three separate closings . . . ."); id. ("At the second closing . . .

10

the Buyer shall purchase from the Seller . . . ."). Moreover, the placement of "subject to market conditions" in Section 3 of the DPA ("Closing") and not Section 1 ("Purchase and Sale of the Convertible Note"), which describes the seller's agreement to transfer the rights to all $145,000 of the note, indicates that to the extent such a condition precedent to the second and third closings exists, it is with respect to the mechanics and timing of the closing, not the obligation to sell. As we previously explained, we do not believe the DPA is an option contract. See July 23 M&O at 8.

Second, even if defendants were correct that the "subject to market conditions" language made the second and third closings optional, it gave that option to Coventry, not to CLSS. The language "and subject to market conditions" modifies the subsequent clause, describing an obligation of the buyer. No reasonable reading of this sentence would result in an option for CLSS, the seller. Defendants' repeated statement that the DPA provided "purchase options" with respect to the second and third closings, Mem. of Law in Opp'n to Pl.'s Mot. for Summ. J. at 8, 13, 14, 16, 17 ("Opp'n") (emphasis added), further supports this conclusion. Therefore, to the extent the language authorizes a refusal to consummate the second closing, that option would belong to Coventry, not defendants.

Third, even if CLSS were correct that the "subject to market conditions" clause provided both CLSS and Coventry the ability to refuse to close the transaction, that refusal must be based on "market conditions." This phrase goes undefined in the DPA. But whatever "subject to market conditions" means, it surely does not mean an unconditional option to refuse the second closing. Tellingly, defendants have not proposed any specific market condition that triggered their purported option not to close. For these reasons, we conclude that there is no ambiguity in the DPA as to whether the clause "subject to market conditions" provides CLSS an unconditional option not to close. Its non-performance cannot be excused on this basis.

**2. "Within 30 Days"**

Second, defendants inexplicably re-raise the argument we considered and rejected in connection with their motion to dismiss: that Coventry's October 14 wire was untimely because it did not occur "within 30 days of the first closing," a period that ended October 11.

As we explained, "a New York statute governing the recurrent problem of contractual deadlines that fall on weekends and holidays totally undermines defendants' position that Coventry's payment was untimely." July 23 M&O at 6. Specifically, Section 25 of the General Construction Law provides in relevant part:

> Where a contract by its terms . . . authorizes or
> requires the payment of money or the performance of a
> condition within or before or after a period of time
> computed from a certain day, and such period of time
> ends on a Saturday, Sunday or a public holiday, unless
> the contract expressly or impliedly indicates a
> different intent, such payment may be made or condition
> performed on the next succeeding business day . . .
> with the same force and effect as if made or performed
> in accordance with the terms of the contract.

N.Y. Gen'l Const. Law § 25(1).   "Therefore, a default rule of contractual interpretation in New York is that if a period of time for the payment of money or performance of a condition ends on a weekend day or public holiday, that period of time is extended until the next business day."  July 23 M&O at 7 (citing Fishoff v. Coty Inc., 634 F.3d 647, 652-53 (2d Cir. 2011); Li v. Astoria Fed. Sav. & Loan Ass'n, 81 A.D.2d 857, 858, 438 N.Y.S.2d 865 (2d Dep't 1981)).   Whether Coventry's bank was open during the weekend, or whether Coventry could have made the payment on an earlier day, is beside the point.

Here, the first closing took place on September 11.  The second closing was to take place within thirty days, but the thirtieth day was a Saturday, the thirty-first day was a Sunday, and the thirty-second day was a public holiday.[8]   Thus,

---

[8]   See N.Y. Gen'l Const. Law § 24 (defining Columbus Day as a public holiday).

Coventry's payment on the thirty-third day, October 14, was timely.[9]

We reject defendants' rejoinder that Section 25 does not apply because the Paragraph 3 of the DPA expressly indicates an intent to avoid the rule of Section 25.  Opp'n 15.  The use of the generic term "shall occur within 30 days" does no such thing, and the DPA never mentions October 11 as an important date or that time is of the essence.  To read such intent into the DPA's generic language is inconsistent with the plain meaning of Section 25.

Finally, defendants repeatedly characterize the second and third closings as "options to purchase," seeking to benefit from the rule that options expire after the time period specified in the option.  We have previously considered and rejected this argument.  See July 23 M&O at 8 ("We do not think that the DPA is an option contract, but even if it were, Section 25 would nonetheless apply.  The Second Circuit, the New York Court of Appeals, and the First Department have each applied the Section 25 rule to options." (citing cases)).  "Thus, even viewing the second closing as an option, Coventry retained the power to exercise that option on October 14." Id.

---

[9]     At oral argument, we asked defendants on what basis they contended that the Court should vary from its previous ruling on this issue.  Their response -- that the summary judgment context affords them the benefit of every reasonable inference -- is wholly unpersuasive, as our decision relied on undisputed facts, afforded no presumption to the plaintiff, and was made as a matter of law based on the plain meaning of a controlling New York statute.

### 3. The Third Closing

Third, defendants argue they are not liable with respect to the third closing because plaintiff made no attempt to consummate it. Opp'n 17. However, the undisputed evidence shows that CLSS repudiated the contract.

"Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty." Lucente v. Int'l Bus. Machs. Corp., 310 F.3d 243, 258 (2d Cir. 2002). When faced with an anticipatory repudiation, the non-repudiating party must choose either to (1) elect to treat the repudiation as a breach and seek damages for breach of contract, thereby terminating the contract; or (2) continue to treat the contract as valid and wait for the designated time of performance to bring suit. Id. In this way, the doctrine of anticipatory repudiation "relieves the nonrepudiating party of its obligation of future performance and entitles that party to recover the present value of its damages from the repudiating party's breach of the total contract." Am. List Corp. v. U.S. News & World Report, Inc., 75 N.Y.2d 38, 44, 549 N.E.2d 1161 (1989).

Here, by writing to Coventry that "we are deciding not to move forward with the sale of the remaining balance of the note," CLSS clearly expressed that it did not intend to complete third closing. Sanomedics communicated a similar message, writing, "we

were informed by CLSS Holdings that they are not selling the note."

Plaintiff took immediate action by sending a demand letter that day and filing a complaint soon after, clearly electing to treat the defendants' repudiation as breach. In this context, tendering the funds for the third closing was not necessary. See Strasbourger v. Leerburger, 233 N.Y. 55, 60, 134 N.E. 834 (1922) ("The law requires no one to do a vain thing. A formal tender is never required where by act or word the other party has shown that if made it would not be accepted.").[10]

**4. Sanomedics' Liability**

Finally, defendants argue that Sanomedics "cannot be held liable because it did not agree expressly or implicitly to assume any responsibility or risks." Opp'n 12. However, Sanomedics executed the DPA, in which it specifically agreed to treat Coventry as "having all the rights of" CLSS with respect to the notes sold. DPA § 4.5(ii). Sanomedics breached this obligation by refusing to issue Coventry a replacement note once Coventry had paid CLSS for the second closing, and by refusing to honor Coventry's October 15 conversion request. Defendants offer no response to this more specific claim. Therefore, while CLSS is

---

[10]    Moreover, under the DPA, the third closing must occur "within 30 days" of the second closing. Because the second closing never occurred, the third closing could not either. Therefore, it is doubtful Coventry even had the option to continue to treat the contract as valid and attempt to consummate the third closing.

perhaps the primary instigator of this dispute, Sanomedics' conduct was inconsistent with its obligations under the DPA and also contributed to Coventry's damages.

**D. Damages**

In its papers, plaintiff presents a number of proposals for calculating the damages it suffered as a result of defendants' breach. Such an analysis depends on disputed issues of fact and therefore is inappropriate to resolve at this stage. However, we offer the following observations to guide the parties' future submissions. See Lucente, 310 F.3d at 261 ("Although the amount of recoverable damages is a question of fact, the measure of damages upon which the factual computation is based is a question of law." (internal quotation marks omitted)).

The calculation of damages in a breach of contract case governed by New York law is guided by two fundamental principles. First, "damages for breach of contract should put the plaintiff in the same economic position he would have occupied had the breaching party performed the contract." Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 196 (2d Cir. 2003); see Lucente, 310 F.3d 262. Second, "New York courts are clear that breach of contract damages are measured from the date of the breach." Oscar Gruss, 337 F.3d at 196; see Sharma v. Skaarup Ship Mgmnt. Corp., 916 F.2d 820, 825 (2d Cir. 1990); Simon v. Electrospace Corp., 28 N.Y.2d 136, 145, 269 N.E.2d 21, 26 (1971). "It is also

fundamental that, where the breach involves the deprivation of an item with a determinable market value, the market value at the time of the breach is the measure of damages." Sharma, 916 F.2d at 825.[11]

Two relevant conclusions follow. First, that Coventry would have had to convert the notes and sell the conversion shares in order to profit does not, as defendants suggest, render the alleged damages "loss of profits on collateral business arrangements." Opp'n 18. Instead, Coventry may claim general damages based on the market value of the non-delivered securities on the date of breach. Such claims are regularly allowed in cases involving similarly "in-the-money" financial instruments. See Oscar Gruss, 337 F.3d at 197 (warrants); Hermanowski v. Acton Corp., 729 F.2d 921, 922 (2d Cir. 1984) (options); Aristocrat

---

[11]    The market value on the date of breach incorporates future expectations of profit. As the Second Circuit has explained:

> Measuring contract damages by the value of the item at the time of the breach is eminently sensible and actually takes expected lost future profits into account.  The value of assets for which there is a market is the discounted value of the stream of future income that the assets are expected to produce.  This stream of income, of course, includes expected future profits and/or capital appreciation. To be sure, uncertainties about the future and lack of perfect information may cause an asset to be under- or over-valued at any particular time.  At that time, however, either party has an opportunity to hedge according to his or her judgment about the future stream of income.  New York courts have thus explicitly upheld damage awards based on "what knowledgeable investors anticipated the future conditions and performance would be at the time of the breach" and have rejected awards based on what "the actual economic conditions and performance" were in light of hindsight.

Sharma, 916 F.2d at 826 (quoting Aroneck v. Atkin, 90 A.D.2d 966, 967, 456 N.Y.S.2d 558, 559 (4th Dep't 1982)).

Leisure Ltd. v. Deutsche Bank Trust Co. Ams., 618 F. Supp. 2d 280, 299-300 (S.D.N.Y. 2009) (convertible notes).  Defendants' related suggestion -- that plaintiff suffered no actual damages because its $49,000 purchase price for the second closing was returned in full, Opp'n 18 -- is similarly misguided.

Second, the measure of damages must correctly value the withheld convertible notes as of the date of breach.  Such a valuation must account for the attendant restrictions on conversion and liquidation associated with the notes.  Therefore it cannot be presumed, as plaintiff proposes, that all $95,000 in principal was convertible to about ten million shares that were all salable on one day, given that conversion could not result in beneficial ownership of more than 4.99% of outstanding stock.  Further, a proper analysis would require consideration of the impact of the sale of a substantial number of shares on the market price of SIMH stock.

At oral argument, we suggested that a possible measure of damages might be the profit actually earned by CLSS, assuming that CLSS converted the disputed notes and sold the conversion shares.  After CLSS's counsel disclaimed knowledge of whether his client had converted any portion of the remaining $95,000 of the Sanomedics note, we ordered discovery of the events following CLSS's refusal to consummate the second closing.  Presumably this

discovery should be the predicate for plaintiff's damage calculations.

### III. CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is granted in part and denied in part. The parties are directed to submit a joint letter on or before July 11, 2016, summarizing the status of the case and the progress of their discovery on the issue of damages.

**SO ORDERED.**

Dated:     New York, New York
           June ___, 2016

NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE

20

Copies of the foregoing Memorandum and Order have been mailed on this date to the following:

**<u>Attorney for Plaintiff</u>**

Stanley C. Morris, Esq.
Corrigan & Morris LLP
201 Santa Monica Blvd., Suite 475
Los Angeles, CA 90401

**<u>Attorney for Defendants</u>**

D. Giacomo Vilella, Esq.
225 Broadway, Suite 2000
New York, NY 10007